**UNITED STATES DISTRICT COURT**
**DISTRICT OF CONNECTICUT**

| | |
|---|---|
| **EVA M. RHODES,** | : |
| **PLAINTIFF,** | : |
| | : **CIVL ACTION NO.** |
| | : **3:10cv1289(VLB)** |
| | : |
| **v.** | : **DECEMBER 29, 2011** |
| | : |
| **FIRST RELIANCE STANDARD LIFE** | : |
| **INURANCE COMPANY,** | : |
| **DEFENDANT.** | : |

<u>**MEMORANDUM OF DECISION GRANTING IN PART AND DENYING IN PART**</u>
<u>**DEFENDANT'S MOTION FOR SUMMARY JUDGMENT AND GRANTING IN**</u>
<u>**PART AND DENYING IN PART PLAINTIFF'S CROSS MOTION FOR**</u>
<u>**SUMMARY JUDGMENT [DKTS. ## 34, 36]**</u>

The Plaintiff, Eva Rhodes ("Rhodes"), proceeding pro se, brings this

action against First Reliance Standard Life Insurance Company ("FRSLIC"),

the Claims Evaluator and Claims Payor of a Long Term Disability Plan

established by Barnes & Noble for the benefit of its employees.  The

Plaintiff became a beneficiary of the Plan on July 7, 2007.  The Plaintiff

brings this action under the Employee Retirement Income Security Act of

1974 ("ERISA") and alleges that FRSLIC acted in an arbitrary and

capricious manner in denying her claim for long-term disability benefits.

Defendant has moved for summary judgment arguing that its decision to

deny Plaintiff long term disability benefits was not arbitrary and capricious.

Plaintiff has cross-moved for summary judgment arguing that the decision

was an abuse of discretion and seeks a reinstatement of benefits for her

chronic low back pain and major clinical depression.  In particular, Plaintiff argues that her chronic lower back condition prevents her from performing the material duties of any occupation and therefore she qualifies as totally disabled under the plan and is entitled to long term disability benefits.  In addition, Plaintiff argues that she is entitled to additional long term benefits as a result of her mental health disorder.  For the reasons stated hereafter, Defendant's motion for summary judgment is granted in part and denied in part and Plaintiff's cross motion for summary judgment is granted in part and denied in part.

### Facts

The parties' pleadings and the submissions filed in accord with the Defendant's motion for summary judgment and the Plaintiff's cross motion for summary judgment establish the following undisputed facts.

Rhodes began working at Barnes & Noble, Inc. ("Barnes & Noble") on January 31, 2000 as a Merchandising Assistant.  (Administrative Record "AR" 512).  Barnes & Noble held an Income Replacement Benefits for Total Disability from Sickness or Injury Insurance Policy ("policy" or "plan") with FRSLIC.  (AR 63-90).  As a Class 2 employee of Barnes & Noble, Rhodes was a participant in this policy. (AR 69 & 681).  FRSLIC both determined an employee's eligibility and paid benefits from its own account.  [Dkt. #34, Def. Mem.].

FRSLIC's policy states that "[w]e will pay a Monthly Benefit if an Insured: (1) is Totally Disabled as the result of a Sickness or Injury covered

by this Policy; (2) is under the regular care of a Physician; (3) has completed the Elimination Period; and (4) submits satisfactory proof of Total Disability to us." (AR 79).  "Totally Disabled" for Class 2 employees is defined "as a result of an Injury or Sickness: (1) during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable, an Insured cannot perform the material duties of his/her regular occupation … (2) after a Monthly Benefit has been paid for 24 months, an Insured cannot perform the material duties of any occupation.  Any occupation is one that the Insured's education, training or experience will reasonably allow.  We consider the Insured Totally Disabled if due to an Injury or Sickness he or she is capable of only performing the material duties on a part-time basis or part of the material duties on a Full-time basis." (AR 72).

FRSLIC's policy has a specific limitation for mental or nervous disorders which provides that "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months unless the Insured is in a Hospital or Institution at the end of the twenty-four (24) month period." (AR 82).  Mental or nervous disorders are defined as "disorders which are diagnosed to include a condition such as … mental illness." (AR 82).

i.   *Rhodes's Physical Disability Claim*

On or around February 18, 2007, the Plaintiff submitted a claim to FRSLIC for long-term disability benefits.  (AR 693-94).  The basis for her

3

claim was "severe pain in back, muscle spasms severity [sic].  Difficult to sit or walk" arising from a car accident on July 29, 2006. (AR 693).  Supporting Rhodes's claim was a physician's statement prepared on February 9, 2007 by Rhodes's treating physician, Allison Kerr, M.D.  According to Dr. Kerr's statement, Rhodes' symptoms were "pain in lower back and neck after a motor vehicle accident.  Unable to sit or walk due to severe spasms." (AR 575).  Dr. Kerr indicated under restrictions that "patient unable to sit for any length of time or any kind of activity at this time" but that Rhodes would achieve a full recovery in 5-6 months.  (AR 576).

FRSLIC initially determined that Rhodes did not meet the definition of "Totally Disabled" under their policy because her back pain was a preexisting condition.  (AR 529-30).  During that time, Rhodes became employed at the Robert Half Temp Agency with her first assignment on July 17, 2007 which continued until she began working for ING Inc. ("ING") as the Senior Administrative Assistant to the VP of Human Resources from December 2007 through June 10, 2008. (AR 285, 475 & 511).  Several months later, on January 18, 2008, FRSLIC notified Rhodes by letter that they had changed their preexisting condition standard due to a descision rendered in the case of *Benesowitz v. Metropolitan Life Insurance Company*, reported at 8 N.Y.3d 661 (2007), and informed Rhodes that she might qualify for a disability claim. (AR 521).

FRSLIC notified Rhodes on April 7, 2008 that she qualified for long term disability benefits only for a closed period of time of July 7, 2007 through July 17, 2007 due to her subsequent employment. (AR 501-03). FRSLIC explained that since Rhodes "reported to us that you were essentially doing the same kind of work at ING as you had been performing at Barnes & Noble, we determined that as of July 17, 2007 you were no longer Totally Disabled as defined by the policy." (AR 481).

Rhodes responded by letter dated July 17, 2008 stating that she "did not perform the same type of work in the subsequent positions that I held after the position I held with Barnes & Noble." (AR 475).  In the letter she detailed her responsibilities at Barnes & Noble that included lifting boxes of books.  In contrast, at the Robert Half Agency she stated that "I filled in temporarily … for a variety of positions none of which included lifting boxes of books" and at ING she "primarily answered emails, scheduled meetings and handled expense and travel paperwork." (AR 475).  Based on this additional information regarding the nature of her job responsibilities and duties at Barnes & Noble versus her job responsibilities and duties at the Robert Half Agency, FRSLIC classified her job at Barnes & Noble as "light" and her current job at ING as "sedentary." (AR 467).

After reconsideration in light of the information Rhodes provided regarding her position at Barnes & Noble, FRSLIC concluded that Rhodes could not perform the material duties of her regular occupation at Barnes & Noble including light lifting duties and therefore met the definition of

"Totally Disabled" during the Elimination Period and for the first 24 months for which a Monthly Benefit is payable.  FRSLIC notified Rhodes on October 23, 2008 that her long-term disability benefits were approved retroactive to July 17, 2007 through November 6, 2008. (AR 395).  FRSLIC also notified Rhodes that her continued receipt of long term disability beyond November 6, 2008 would have to be supported by ongoing documentation of her continuous disability.  (AR 396).

On November 11, 2008, Dr. Kruger, Rhodes's treating orthopedist, reported to FRSLIC that he conducted an MRI on October 7, 2008 which did "not reveal significant pathology."  (AR 370-371).  Dr. Kruger stated that "I do believe Ms. Rhodes has significant health issues, however, I do not believe they are organically related to her spine."  Dr. Rhodes further indicated that Rhodes "is being treated for depression.  Perhaps this is a somatization of significant underlying psychiatric disease."  (AR 370).  Somatization is defined as "conversion of a mental state into physical symptoms; also the existence of physical bodily complaints in the absence of a known medical condition."  *Somatization Definition*, MERRIAM-WEBSTER.COM, http://www.merriam-webster.com/dictionary/somatization (last visited November 7, 2011).  Somatization disorder is a mental illness usually beginning before age 20 characterized by multiple physical complaints for which no physical cause can be found.  *Somatization Disorder Definition*, DICTIONARY.COM,http://dictionary.reference.com/browse/somatization+disord

er (last visited November 7, 2011).  Lastly, Dr. Kruger concluded that "[a]lthough I suspect she has a disability, it is not clear to me that this disability is related to an orthopedic problem with her spine" and indicated that Rhodes will follow-up with him on an as needed basis.  (AR 371).

After considering this documentation, FRSLIC notified Rhodes by letter dated February 20, 2009 that it had determined that she was no longer entitled to disability benefits based on physical disability citing its medical department's review of all medical records submitted and its determination that her "complaints of Low Back Pain [] are not severe enough to support you being totally disabled as defined by your policy." (AR 337-338). FRSLIC based its determination on Dr. Kruger's evaluation in which he opined that Rhodes's repeat lumbar MRI findings in 10/2008 do not reveal "significant pathology," that Rhodes's back pain was not her "primary condition" and questioned whether Rhodes's back pain was a somatization of her underlying psychiatric disease. (AR 370).

Rhodes appealed the February 20, 2009 decision denying her benefits in a letter dated March 27, 2009 and once again argued that she could not return to her previous job at Barnes & Noble because she "cannot frequently lift 10-20 pounds … the boxes and books are frequently a great deal heavier than that." (AR 325).

On August 31, 2009, FRSLIC wrote to Rhodes summarily informing her that "[w]e have determined that our original decision to terminate LTD benefits should be reversed."  (AR 288).  However, FRSLIC did not explain

the basis or reasons for their determination.  It is unclear whether this reversal is related to Rhodes's lower back pain claim or mental health claim and whether it involved a redetermination of the Plaintiff's mental and physical health claim. (*id.*).

As stated above after receiving twenty-four months of disability, the definition of "total disability" under the plan changes.  After a Monthly Benefit has been paid for 24 months, "Total Disability" is defined as a disability the result of which "an Insured cannot perform the material duties of any occupation.  Any occupation is one that the Insured's education, training or experience will reasonably allow." (AR 72).   In July 2009, Rhodes had received twenty-four months of disability payments under the plan.  Accordingly, in September 2009, FRSLIC conducted a residual employability analysis ("REA") based on internal medical reviews of documentation from Rhodes's treating physicians in order to determine if Rhodes qualified as totally disabled under this new definition.  (AR 267). The REA found that Rhodes could perform the material duties of several sedentary jobs and that "[t]he claimant has transferrable skills." (AR 267).

Based on this REA, on October 2, 2009, over twenty-four months since her claim began, FRSLIC notified Rhodes that she no longer qualified for disability benefits stating that "[b]ased on the available medical information as well as information about your training, education and experience, we have determined that you can perform and would qualify for the following sedentary occupations: Administrative Clerk; Secretary;

Customer Service Representative; Contact Clerk; Passenger Rate Clerk; Order Clerk." (AR 255).

On November 10, 2009, Rhodes appealed the decision and argued that a medical evaluation by Dr. Mohr, another treating orthopedic specialist at the University of Connecticut Health Center substantiated her claim that she is unable to perform the material duties of any occupation including sedentary occupations. (AR 251-252).  Dr. Mohr reported that Rhodes "is alert, oriented, pleasant, and interactive, in no apparent distress.  She does appear markedly uncomfortable.  She is able to rise from a chair.  She walks about the exam room with an antalgic gait to the right."  (AR 291-292).   Dr. Mohr concluded that based on a June 8, 2009 MRI that Rhodes had "moderate to severe foraminal stenosis to disc bulge and facet DJD, otherwise the degenerative disease that is mild throughout." (Id.).  Dr. Mohr also indicated that Rhodes has "signs and symptoms of axial low back pain with a radicular component that is very severe.  She does not have any deficit of reflex or strength" and that he would "like her to do another trial of physical therapy" and "try her on Neurontin."  In these reports, Dr. Mohr does not opine on whether Rhodes is capable of performing the material duties of a sedentary occupation.

Rhodes submitted in conjunction with the reports from Dr. Mohr a one page "return to work/school" form dated 11/9/2009 from the University of Connecticut Health Center in which there is a check mark next to a row regarding "return to work/school" and there is handwriting indicating that

9

the "estimated time out" to be "eight months."  (AR 253).  Next to that row, there is a nearly illegible handwritten note stating "Bend, Lift, Twist, Sitting, Sedentary Work." (*Id.*).  There is no opinion expressed in reference to the listed movements.  There is no indication of the basis of ab opinion, no medical or diagnostic tests referenced.  Dr. Mohr's does not articulate the pathology of Rhodes's pain and inability to return to work for eight months.  There are two different sets of handwriting on the form.  Lastly, while the form indicated that Rhodes was examined on November 8, 2009, there is no indication on the form that Rhodes is scheduled for a reevaluation or a follow up examination.

FRSLC hired Raymond J. Chagnon, M.D. to conduct an independent medical evaluation ("IME") to ascertain the level of Rhodes's physical disability in connection with her appeal. (AR 227-236).  On January 28, 2010, Dr. Chagnon issued a report in which he concluded that Rhodes "has low back pain radiating into her legs … as a result of her chronic back pain and leg pain she can sit frequently, she can stand frequently, she can walk occasionally." (AR 230).  Dr. Chagnon also concluded that Rhodes can work on the sedentary lift level. (AR 232).

On March 10, 2010 FRSLIC notified Rhodes that her appeal on her physical disability claim was denied as she possesses sedentary work capacity based on the REA and Dr. Chagnon's IME and that she had exhausted all appeals for her physical disability claim.  (AR 197-200).

*ii.    Rhodes's Mental Health Disability Claim*

Rhodes first sought treatment for depression in September of 2008 when she began treatment with a psychiatrist, Dr. Lorenzo, after she had been brought to the emergency room in a state of emotional crisis.  (AR 370-371).   Rhodes also began treatment for depression with a therapist, Edwina Walker at the same time.

In December of 2008, Dr. Lorenzo and Walker provided FRSLIC with documentation regarding her mental health condition.  Dr. Lorenzo reported that Rhodes suffers from "major depression, single episode moderate degree" and recommended "treating depression with antidepressant medication."  (AR 361-362).  In particular on December 12, 2008, Dr. Lorenzo indicated that Rhodes was still depressed and that she is "unable to return to work due to persistent depression."  He also scheduled Rhodes for a follow-up examination in three months.  [*Id.*]. Walker reported that Rhodes "exhibits a depressed affect with tearfulness or a constricted affect" and stated that she did not recommend that Rhodes return to work as she "has shown continued depression." (AR 379).

After considering this documentation, FRSLIC notified Rhodes by letter dated February 20, 2009 that they had determined that she did not qualify for disability benefits based on her mental health disorder because "[o]ur medical department has reviewed all medical records submitted and has determined that your complaints of [] Depression are not severe

11

enough to support you being totally disabled as defined by your policy."
(AR 337-338).  In particular, FRSLIC reasoned that Walker's documentation
was not persuasive as it did not "qualify [Rhodes's] mental status exams to
demonstrate depressive symptoms that would preclude work."  (AR 338).
FRSLIC further reasoned that while Walker noted Rhodes's need for eight
more weeks of medical treatment, Rhodes had been on the same dose of
Prozac since October 2008 and that Dr. Lorenzo has not increased or
changed that dosage.  FRLSIC concluded that Dr. Lorenzo's note on
December 12, 2008 which indicated that Rhodes was not able to return to
work was also not persuasive since Dr. Lorenzo had scheduled a follow up
examination in the next the three months.  FRLSIC reasoned that "if your
symptoms were moderate to severe enough to continue to impair work,
than it would be reasonable to assess you would continue to need
medication adjustments until your symptoms had improved.  In summary,
your office visit notes from both mental health providers do not
demonstrate psychiatric restrictions & limitations are commensurate with
work impairment." (AR 338).

     Rhodes appealed the February 20, 2009 decision denying her
benefits in a letter dated March 27, 2009 and once again argued that she
could not return to her previous job at Barnes & Noble.   She discussed her
mental health diagnosis of major depressive disorder and provided
updated information from Dr. Lorenzo and Walker to substantiate her claim.
(AR 326).  As noted above, on August 31, 2009, FRSLIC reversed its denial

without explaining its reason.  As noted above, it is unclear whether this reversal is related to Rhodes's mental health claim or lower back pain claim and whether it was based on an evaluation of the Plaintiff's mental and physical health claims. (*id.*).  A letter dated March 10, 2011 suggests FRSLIC's August 2009 denial was based solely on Rhodes's physical disability claim.

On March 10, 2010 FRSLIC notified Rhodes that her physical disability claim was denied but advised her that "our current review of your claim file also noted numerous references to your past psychiatric treatment as well … we believe that more review is needed to determine the extent and duration of your psychiatric impairment.  Therefore, we are returning your claim file to the claims department for further review concerning your psychiatric condition alone … If, following review of additional information, an adverse claim decision is made concerning your claim for benefits from a psychiatric perspective alone, you will be allowed one additional appeal, based upon that decision." (AR 199 - 200).

In response, Rhodes provided updated information regarding her mental health condition.  *See* (AR 144).   After reviewing the additional material and conducting an internal review of Rhodes's psychiatric file, FRSLIC notified Rhodes by letter dated April 20, 2010 that her Long Term Disability benefits were approved for a closed period of time of July 6, 2009 through January 12, 2010.  (AR 175-178).  FRLSIC stated that "[o]ur medical department has reviewed all medical records submitted and has

13

determined that your concurrent impairing psychiatric component are not severe enough beyond January 12, 2010 to support you being totally disabled as defined by your policy." (AR 176).  FRLSIC's reasoned that on January 12, 2010, Dr. Lorenzo prescribed Rhodes Zoloft and that "Dr. Lorenzo's records demonstrates you have ongoing chronic depressive and anxiety symptoms and life stressors, by that they are not severe enough to continue to preclude work.  Dr. Lorenzo's notes do not note any paranoid or psychotic thinking and do demonstrate depressive symptoms have improved on Zoloft."  In addition, FRLSIC concluded that the "medical narrative from Edwina Walker does not correlate with Dr. Lorenzo's medical and is too vague to demonstrate that continued psychiatric functional limitations are supported."  (AR 177).

Rhodes appealed the April 20, 2010 decision and argued that her mental condition has not changed since July 2009 when her benefits were extended until January 2010. (AR 135 & 141-42).

In response to her appeal, FRSLIC contracted with Peter Zeman, M.D. to conduct an IME regarding her mental health claim.  (AR 114-121).  On August 11, 2010, Dr. Zeman produced a report on Rhodes's mental health condition.   Dr. Zeman reported that Rhodes indicated that her "physical and emotional symptomatology … began by her account in 2005 [and] have affected her life."  (AR 115).  Dr. Zeman noted that Rhodes informed him that "since 2005, my pain and depression have destroyed my well being and my life." (AR 116).  Dr. Zeman's concluded that her mental status

examination showed "no evidence of psychotic illness" but did "reveal evidence of a severe depression" and that Rhodes suffers from "Major Depressive Disorder, single episode, severe without psychotic features." (AR 117-118).  Dr. Zeman further concluded that:

> Ms. Rhodes has been psychiatrically impaired as of February 5, 2007. Her status has not changed since that time, and she continues to be severely impaired by major depression.  The psychiatric component of Ms. Rhodes' illness became a contributing factor to her overall medical condition beginning in 2005.  Ms. Rhodes' psychiatric functional ability as of 1/12/2010 was Class 4 marked impairment.  In my opinion, the degree of her impairment…have significantly impeded her useful work function as of January 12, 2010 and ongoing.  In my opinion, Ms. Rhodes' prognosis for return to work is very guarded.  She has been and remains totally disabled from work function since June 2008.  (AR 118).

A month later on September 10, 2010, FRSLIC notified Rhodes that they were denying her claim of total disability based on psychiatric impairment and she was not entitled to further long-term disability benefits. (AR 4-9).  FRSLIC concluded based on Dr. Zeman's evaluation that "your diagnosis of chronic low back pain and Major Depressive Disorder presented concurrently as of December 2005, and therefore, the benefits payable in connection with your psychiatric claims should be limited to the 24-month period covering July 6, 2007 until July 6, 2009 following the date benefits became effective." (AR 8).  FRSLIC also noted that "[a]lthough your psychiatric impairment appears to be supported beyond January 12, 2010, you have exhausted the Maximum Duration of Benefits allowed under the policy." (*Id.*).  With Rhodes's administrative claims exhausted, Rhodes filed suit in this Court against FRSLIC on August 11, 2010.

**Legal Standard**

Rule 56 of the Federal Rules of Civil Procedure provide that a court may grant a motion for summary judgment when the "movant shows that there is no genuine dispute as to material fact." Fed. R. Civ. P. 56(a).  "[A] material fact is 'genuine,' that is, if the evidence is such that a reasonable jury could return a verdict for the nonmoving party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 248 (1986).  "The duty of the court is to determine whether there are issues to be tried; in making that determination, the court is to draw all factual inferences in favor of the party against whom summary judgment is sought, viewing the factual assertions in materials such as affidavits, exhibits, and depositions in the light most favorable to the party opposing the motion. " *Rodriguez v. City of New York*, 72 F.3d 1051, 1060-1061 (2d Cir. 1995).  An ERISA claim is analyzed using a different standard.  See *Mohamed v. Sanofi-Aventis Pharmaceuticals*, No.06CIV.1504, 2009 WL 4975260, at *8 (S.D.N.Y. Dec. 22, 2009).

"[A] denial of benefits challenged under [ERISA] must be reviewed under a de novo standard unless the benefit plan gives the administrator or fiduciary discretionary authority to determine eligibility for benefits or to construe the terms of the plan." *Mugan v. Hartford Life Group Insurance Company*, 765 F.Supp.2d 359, 368 (S.D.N.Y. 2011) (citing *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S. 101, 115 (1989)).  When the benefit plan grants the administrator the authority to determine eligibility for benefits, "a court may not overturn the administrator's denial of benefits unless its

actions are found to be arbitrary and capricious, meaning 'without reason, unsupported by substantial evidence or erroneous as a matter of law.'" *McCauley v. First Unum Life Ins. Co.,* 551 F.3d 126, 131 (2d Cir. 2008).

"Substantial evidence is 'such evidence that a reasonable mind might accept as adequate to support the conclusion reached by the [administrator and] ... requires more than a scintilla but less than a preponderance.'" *Celardo v. GNY Auto. Dealers Health & Welfare Trust*, 318 F.3d 142, 146 (2d Cir. 2003) (quoting *Miller v. United Welfare Fund*, 72 F.3d 1066, 1072 (2d Cir. 1995)). "This scope of review is narrow and the Court is not permitted to substitute its own judgment for that of the decision maker." *Burgio v. Prudential Ins. Co. of America*, Np.06-CV-6793, 2011 WL 4532482, at *4 (E.D.N.Y.  Sept. 26, 2011) (citing *Pagan v. NYNEX Pension Plan*, 52 F.3d 438, 442 (2d Cir. 1995) and *Jordan v. Ret. Comm. of Rensselaer Polytechnic Inst.*, 46 F.3d 1264, 1271 (2d Cir. 1995)).

Although, Plaintiff in her motion for summary judgment argues that the Court should apply a *de novo* standard of review, the Court on April 21, 2011 already ruled that the plan at issue clearly and explicitly granted the Defendant discretionary authority to interpret the plan and policy and to determine eligibility for benefits and therefore the Court must apply a deferential standard of review in evaluating the Defendant's denial of the Plaintiff's claim for benefits.  *See* [Dkt. #45].  As the Court noted in its prior Order, the plan expressly reserved its discretionary authority to interpret the plan and policy.  The plan stated that "First Reliance Standard Life

17

**Insurance Company shall serve as the claims review fiduciary with respect to the insurance policy and the Plan. The claims review fiduciary has the discretionary authority to interpret the Plan and the insurance policy and to determine eligibility for benefits." (AR 75).**

   **In addition, courts have held that where a plan administrator both evaluates and pays benefits claims out of its own pocket, the administrator has a conflict of interest that must be taken into account in a court's review under an arbitrary and capricious standard. The conflict of interest analysis was articulated by the Supreme Court in** *Glenn***.** *Metropolitan Life Ins. Co. v. Glenn***., 128 S.Ct. 2343, 2349 (2008) (ERISA "permits a person denied benefits under an employee benefit plan to challenge that denial in federal court … Often the entity that administers the plan, such as an employer or an insurance company, both determines whether an employee is eligible for benefits and pays benefits out of its own pocket.   We here decide that this dual role creates a conflict of interest; that a reviewing court should consider that conflict as a factor in determining whether the plan administrator has abused its discretion in denying benefits; and that the significance of the factor will depend upon the circumstances of the particular case.") (citations omitted).**

   **Here, FRSLIC concedes in its Motion for Summary Judgment that it both evaluated and paid benefits claims out of its own pocket and therefore the Court must take into account and weigh FRSLIC's conflict of interest in determining whether there was an abuse of discretion.** *See* **[Dkt. # 34, Def.**

Mem. at 6-10].  A plaintiff's showing that the administrator's conflict of interest affected the choice of a reasonable interpretation is only one of "several different considerations" that judges must take into account when "review[ing] the lawfulness of benefit denials."  *McCauley*, 551 at 133.  The Court must "determine how heavily to weight the conflict of interest thus identified, considering such circumstances as whether procedural safeguards are in place that abate the risk, 'perhaps to the vanishing point.'"  *Durakovic v. Bldg. Serv. 32 BJ Pension Fund*, 609 F.3d 133, 138 (2d Cir.2010) (citation omitted).  The Second Circuit has further instructed that:

> The weight properly accorded a *Glenn* conflict varies in direct proportion to the likelihood that [the conflict] affected the benefits decision.  'The conflict ... should prove more important (perhaps of great importance) where circumstances suggest a higher likelihood that it affected the benefits decision, including, but not limited to, cases where an insurance company administrator has a history of biased claims administration. It should prove less important (perhaps to the vanishing point) where the administrator has taken active steps to reduce potential bias and to promote accuracy, for example, by walling off claims administrators from those interested in firm finances, or by imposing management checks that penalize inaccurate decisionmaking irrespective of whom the inaccuracy benefits.'

*Durakovic*, 609 F.3d at 139-140 (quoting *Glenn*, 128 S.Ct. at 2351).

### Analysis of FRSLIC's Denial of Rhodes's Physical Disability Claim

Rhodes argues that her persistent lower back condition prevents her from performing the material duties of any occupation and that she is unable to work a sedentary occupation contrary to FRSLIC's determination. Under the plan, since Rhodes had already received 24 months of disability payments in order to qualify for additional benefits she must demonstrate that she is totally disabled meaning that she cannot perform the material

duties of any occupation her education, training or experience will reasonably allow.  (AR 72).

> i.    *FRSLIC's denial of Rhodes's disability claim is supported by substantial evidence and not affected by its conflict of interest*

From a review of the evidence in the administrative record, FRSLIC's determination that Rhodes could perform the material duties of a sedentary occupation is supported by substantial evidence.  FRSLIC relied on both the medical records and reports of Rhodes's three treating physicians, the independent medical evaluation by Dr. Chagnon, and the REA to reach a reasoned conclusion that Rhodes does not meet the plan's definition of total disability.

In addition, there is no evidence that FRSLIC's conflict of interest as plan administrator and payor influenced its decision to deny Rhode's benefits for her physical disability claim.  The decision to deny benefits does not appear to be motivated by self-interest or by a desire to avoid paying benefits but is rather based entirely on a reasoned assessment of the evidence in the administrative record including the evidence provided by both Rhodes's treating physicians and by an independent medical examination.

First, none of the evidence in the record from Rhodes's treating orthopedists suggests that Rhodes would be unable to perform a sedentary occupation.   The first medical report that Rhodes submitted in support of her original disability claim in February of 2007 indicated that

Dr. Kerr, Rhodes's then treating physician, expected Rhodes to make a "full recovery" in "5-6" months.  (AR 576).

Rhodes's treating orthopedist Dr. Kruger reported on November 11, 2008 that he did not believe Rhodes's health issues were "organically related to her spine" and that her MRI results did "not reveal significant pathology."  (AR 370-371).  He further noted that Rhodes suffered from depression and suggested that "[p]erhaps this is somization of significant underlying psychiatric disease" as "it is not clear to me that this disability is related to an orthopedic problem with her spine." (*Id.*).

Lastly in November 2009, Rhodes submitted additional documentation from a third treating orthopedist, Dr. Mohr, in support of her physical disability claim. (AR 251-252).  While Dr. Mohr's evaluation did indicate that Rhodes suffered from "axial low back pain with a radicular component that is very severe" he also noted that Rhodes was not in distress and did not have any deficit of reflex or strength.  Dr. Mohr also concluded that Rhodes's degenerative disease is otherwise mild throughout.  (*Id.*).  Dr. Mohr's evaluation does not opine on her ability to work nor is there any information provided that would suggest that Rhodes could not perform the material duties of a sedentary occupation.

Rhodes also included with this documentation from Dr. Mohr a "return to work/school" form dated November 9, 2009 indicating that Rhodes should not return to work for an additional eight months. (AR 253).  The form does not reference the type of work Rhodes would perform if she

returned and does not state that she cannot execute the movements listed therein or perform any work ever.  It was therefore not arbitrary and capricious to conclude that the "return to work/school" form was not credible evidence of work impairment that Rhodes was totally disabled as defined by the Plan.  The other records submitted by Rhodes further support FRSLIC's conclusion.  Neither Dr. Kerr, Dr. Kruger, nor Dr. Mohr opined that Rhodes could not perform any work and their opinions undermine any probative value of the return to work/school form.  A reasonable mind viewing just the evidence in the record from Rhodes's treating physicians could conclude that Rhodes was not unable to perform the material duties of a sedentary occupation.

Moreover, FRSLIC also conducted a REA based on its internal reviews of the documentation in Rhodes file from her treating physicians which found that Rhodes was able to perform a sedentary occupation.  FRSLIC also retained Dr. Chagnon to conduct an IME.  Dr. Chagnon is the only physician who the records states reviewed all of Rhodes's files, including all of the MRI's performed on Rhodes since 2006.  Based on his comprehensive review, he reached the conclusion that Rhodes was capable of sitting, standing and walking "frequently" and therefore could perform the material duties of a sedentary occupation.  (AR 227-233).  The evidence provided by Dr. Mohr and Rhodes's other treating physicians together with the report from Dr. Chagnon constitute substantial evidence supporting FRSLIC's denial of Rhodes's disability benefits.

Lastly, there is no evidence in the record which suggests that FRSLIC was inappropriately influenced by its conflict of interest as plan administrator and payor considering the substantial evidence in the record from Rhodes's own treating physicians which support the determination that Rhodes could perform the material duties of a sedentary occupation. This conclusion is further supported by FRSLIC's sua sponte suggestion that Rhodes might qualify for a disability benefits based on her mental health condition and its re-examination of its denial of her disability claim. The Court will now address Rhodes's specific claims which are indicative of the existence of management checks to detect and rectify inaccurate decisions.

   ii. *FRSLIC did not arbitrarily rely of Dr. Kruger's evaluation over other medical documentation*

   Rhodes argues that FRLSIC arbitrarily relied on Dr. Kruger's evaluation in light of other medical opinions that contradict his evaluation to support her physical disability claim that FRSLIC's denial of her disability benefits was arbitrary and capricious.  [Dkt. #35, Pl. Mem. of Law in Objection to the Def. Mot. for Summ. J. 8].   Rhodes relies primarily on Dr. Mohr's evaluation and the "return to work/school" form to demonstrate that she was "physically unable to perform the duties of any occupation." [Dkt. #36, Pl. Mot. For Cross Summ. J. 2].  As stated above, Dr. Mohr did not opine that Rhodes was totally disabled.  Moreover, there was substantial evidence in the record including the records of Drs. Kerr, Kruger, and

Chagnon to support the conclusion that Rhodes had not established that she was totally disabled.

>    iii.    **FRSLIC did not arbitrarily conclude that a sedentary occupation would require Rhodes to sit for long periods of time which she is unable to do**

Rhodes argues that her chronic back condition makes it impossible for her to sit for long periods of time and contends that sedentary work will require her to sit for six to eight hours of the day continuously which she is unable to do.  There is simply no support for such a statement.  As FRSLIC concluded, the sedentary occupations it identified that Rhodes is capable of performing do not require that Rhodes sit for six to eight hours a day straight but would allow for Rhodes to stand, stretch, and walk around as well.  The reasonableness of FRSLIC's determination is also underscored by the fact that Rhodes worked in a sedentary occupation at the Robert Half Agency and ING from December 12, 2007 through June 10, 2008 while receiving disability benefits from FRSLIC. (AR 285).

Further, the REA which identified occupations that Rhodes is capable of performing, defines sedentary as "sitting most of the time, but may involve walking or standing for brief periods of time.  Jobs are sedentary if walking and standing are required only occasionally." Occasionally is defined as "[a]ctivity or condition exists up to 1/3 of the time." (See AR 204-205).  Dr. Chagnon's IME concluded that Rhodes could both sit for 24%-66%of an eight hour work day as well as stand for 24%-66% of an eight hour work of an eight hour work day. (AR 232).

Therefore a reasonable mind would accept such evidence as adequate to support the conclusion that Rhodes would be able to perform a sedentary occupation and it was not arbitrary and capricious for FRSLIC to conclude based on the information provided by Dr. Chagnon and her treating physicians that Rhodes could perform a sedentary occupation.

### iv.   FRSLIC did not arbitrarily conclude that Rhodes's prior job with Barnes & Noble was not sedentary

Rhodes further argues that her prior job at Barnes & Noble should be considered a sedentary job and contends that the description of several of the sedentary jobs FRSLIC identified matches the description of her prior job of merchandising assistant as provided by Barnes & Noble.  (AR 683).   Rhodes reasons that if FRSLIC concluded that she was unable to perform the material duties of her prior Barnes & Noble job that she likewise cannot perform the duties of these sedentary jobs since the description of those jobs match.  Rhodes relies on the job description provided by Barnes & Noble as the basis for her argument. (AR 683). However, the Barnes & Noble job description does not describe the level of activity or physical exertion required for the job.  The mere fact that the description of her prior job does not reference any physical requirements does not support an inference that the job should be considered sedentary especially where the record suggests otherwise.

In addition, Rhodes's argument is belied by the evidence in the record submitted by Rhodes herself which indicates that her prior job at Barnes & Noble was not sedentary in nature but rather required light

exertion.  On July 17, 2008, Rhodes appealed FRLSIC's denial of her disability benefits which was based on FRLSIC's conclusion that Rhodes's employment as a secretary at the Robert Half Agency and then at ING precluded a finding of total disability.  Rhodes indicated in her appeal that at Barnes & Noble she had to frequently lift heavy boxes whereas at the Robert Half Agency and at ING she "primarily answered emails, scheduled meetings and handled expense and travel paperwork." (AR 475).  Based on the information Rhodes herself provided, FRSLIC's concluded that her job at Barnes & Noble should be considered "light" work while her job at ING should be considered "sedentary." (AR 467).  Therefore, Rhodes's herself has presented evidence that her position at Barnes & Noble is not equivalent to the other sedentary occupations that FRSLIC identified even though the description of her Barnes & Noble position did not expressly refer to the light lifting duties that was required by the job.   Accordingly, it was not arbitrary and capricious for FRLSIC to conclude that Rhodes could perform a sedentary occupation but could not perform her prior occupation at Barnes & Noble.

> v.     *It was not an abuse of discretion for FRSLIC to not consider Rhodes Social Security Disability Insurance Claim*

Lastly, Rhodes argues that her total disability is demonstrated by the subsequent decision rendered in her social security disability insurance ("SSDI") claim and that it was an abuse of discretion not to consider the SSDI decision.  However, Rhodes's never provided to FRSLIC the SSDI decision and therefore it was not a part of the administrative record that

FRSLIC considered when it made its determination regarding Rhodes's disability claim.  In the Second Circuit, "a district court's review under the arbitrary and capricious standard is limited to the administrative record." *Miller v. United Welfare Fund*, 72 F.3d 1066, 1071 (2d Cir. 1995); *see also Lopes v. First Unum Life Ins. Co.*, No.09-cv-2642, 2011 WL 1239899, at *9 (E.D.N.Y. March 30, 2011) ("Plaintiff's receipt of SSDI was not known to Defendant at any point during Plaintiff's initial claim determination, appeal or post-appeal, and the Court, therefore, will not consider it.").

Moreover assuming arguendo that the SSDI decision was a part of the administrative record, FRLISC would not be required to "accord special deference to the determination of the Social Security Administration." *Durakovic v. Building Serv. 32 BJ Pension Fund*, 609 F.3d 133, 141 (2d Cir. 2010) (citation omitted); *see also Alto v. Hartford Life Ins. Co.*, No.09Civ07763,, 2011 WL 1330863, at *5 n.1 (March 31, 2011) ("plan administrators are not considered 'arbitrary or capricious' for failing to reach the same disability determination as the SSA, nor are they required to do so by ERISA.  Hartford properly identifies its reasons for arriving at the opposite conclusion."); *Lopes,* 2011 WL 1239899, at *9 ("Finally, even if Plaintiff is receiving SSDI for physical injury, the Court concludes that Defendant's decision nonetheless is supported by substantial evidence in the record. While a Social Security Administration ('SSA') determination that a claimant is eligible for SSDI is 'one piece of evidence,' it is 'far from determinative.'") (citations omitted).   It was not an abuse of discretion not

to consider evidence Rhodes never presented and which was not controlling.

**Analysis of FRSLIC's Denial of Rhodes's Mental Health Disability Claim**

> **i.     *FRSLIC's September 10, 2010 decision to deny mental health benefits was arbitrary and capricious***

Rhodes argues that FRSLIC's determination that she had received the maximum benefits recoverable for a mental health disorder under the plan was arbitrary and capricious.  FRSLIC's policy limits the amount of disability benefits a participant can obtain due in whole or in part to a mental disability to a 24-month period.  The plan in relevant part provides: "Monthly Benefits for Total Disability caused by or contributed to by mental or nervous disorders will not be payable beyond an aggregate lifetime maximum duration of twenty-four (24) months."  (AR 82).

On September 10, 2010, FRSLIC notified Rhodes that based on the independent medical examination by Dr. Zeman that it had determined that Rhodes's "diagnosis of chronic low back pain and Major Depressive Disorder presented concurrently as of December 2005, and therefore, the benefits payable in connection with "Rhodes's psychiatric claim should be limited to the 24-month period covering July 6, 2007 until July 6, 2009 following the date benefits became effective." (AR 8).  In particular, Rhodes argues that it was arbitrary and capricious to conclude that her mental health disorder presented concurrently as of December 2005 and accordingly the determination that her mental health disorder was a

28

contributing factor to her "total disability" since 2005 was not supported by substantial evidence in the record.

The only evidence that FRSLIC relies on to support its conclusion that Rhodes's mental health disorder contributed to her "total disability" since 2005 is Dr. Zeman's independent medical examination in which Dr. Zeman reported that "the psychiatric component of Ms. Rhodes' illness became a contributing factor to her overall medical condition beginning in 2005." (AR 118). It appears that the sole basis for Dr. Zeman's conclusion that her mental health disorder was contributing to her "total disability" since 2005 is Rhodes's own statements made to Dr. Zeman during the course of the evaluation that took place in 2010. Dr. Zeman reported that Rhodes stated that, "since 2005, my pain and depression have destroyed my well being and my life." (AR 116). Dr. Zeman further noted in his report that Rhodes described her "physical and emotional symptomatology, which began by her account in 2005." (AR 115). Rhodes contends that she never told Dr. Zeman that her depression began in 2005. [Dkt. #36, Pl. Mot for Cross Summ. J. 3]. A reasonable mind would not accept that Rhodes's alleged statement made to Dr. Zeman during the course of her psychiatric evaluation was adequate to support a conclusion that her mental disorder was a contributing factor to her total disability since 2005. In light of Rhodes's medical history, one would have to probe further to determine the onset of, the progression and the severity of Rhodes's mental illness.

Moreover after reviewing the entire content of Dr. Zeman's report, Dr. Zeman's conclusion that "the psychiatric component of Ms. Rhodes' illness became a contributing factor to her overall medical condition beginning in 2005" is contradicted by his other observations and conclusions provided in the report.  (AR 118).  For example, Dr. Zeman also concluded in the report that "Ms. Rhodes has been psychiatrically impaired as of February 5, 2007.  Her status has not changed since that time, and she continues to be severely impaired by major depression." (AR 118).  Several paragraphs later, he separately concludes that "[i]n my opinion, the degree of her impairment…have significantly impeded her useful work function as of January 12, 2010."  Lastly, Dr. Zeman opines that Rhodes "has been and remains totally disabled from work function since June 2008." (Id.).  Considering the contradicting dates and conflicting conclusions regarding when Rhodes's mental disorder began and when her mental disorder was severe enough to impair her, it was arbitrary and capricious for FRSLIC to adopt the earliest date provided in Dr. Zeman's report.

The arbitrary nature of FRSLIC's decision to adopt the earliest date in Dr. Zeman's report is underscored by the fact that the earlier dates that Dr. Zeman provided do not appear to be related to Rhodes's work function and therefore do not appear to reflect a determination that Rhodes's mental disorder contributed to her "total disability" as defined under the plan. Under the plan, FRSLIC is obligated to make a determination of when a

participant's mental disorder is severe enough that it contributes to the
participant's inability to perform the material duties of his or her
occupation or any occupation.  It is possible that at any given time a mental
disorder is not severe enough to be a contributing factor to a participant's
ability to work.  In Dr. Zeman's report, the only date in which he explicitly
refers to the start of her work impairment as a result of her mental health
disorder is his conclusion that Rhodes was "totally disabled from work
function since June 2008."  (AR 118).

There is no other evidence in the record that would corroborate the
conclusion that Rhodes's mental disorder contributed to her "total
disability" since 2005 beyond Rhodes's purported statements to Dr.
Zeman.  Rhodes first began psychiatric treatment with Dr. Lorenzo and
Walker in September of 2008 and prior to that time Rhodes had no history
of psychiatric treatment.  Accordingly, there are no psychiatric or other
records to substantiate a conclusion that Rhodes's mental disorder was
severe enough to contribute to her total disability prior to the fall of 2008
when she first sought treatment for her depression.  Therefore, FRSLIC's
conclusion that Rhodes's mental health disorder contributed to her total
disability since 2005 is not supported by substantial evidence.

The arbitrary and capricious nature of FRSLIC's determination that
Rhodes's mental health disorder contributed to her total disability since
2005 is further highlighted by FRSLIC's prior decision on February 20, 2009
where it determined that Rhodes's depression was not severe enough to

31

support her being totally disabled based on either her mental condition or a combination of her mental and physical conditions as defined by her policy.  While FRSLIC subsequently reversed their February 20, 2009 decision it did not clearly state the reasons for that reversal.  It is unclear whether the reversal is related to Rhodes's mental health claim or lower back pain claim and whether it involved a redetermination of the Plaintiff's mental and physical health claim. (AR 288).  However, the fact that FRSLIC concluded that in February of 2009 that Rhodes's mental health disorder was not contributing to her total disability but then concluded in September of 2010 that her mental health disorder had contributed to her total disability since 2005 is incongruous on its face.  Further, FRSLIC makes no effort to explain why its conclusion in February of 2009 was erroneous in light of the evidence in the record.

   ii.     *FRSLIC's prior decisions regarding Rhodes's mental health claim demonstrate a pattern of arbitrary and capricious decision making*

   Prior to FRSLIC's September 10, 2010 decision denying Rhodes's mental health disability benefits which is the subject of the current action, FRSLIC made two prior determinations regarding Rhodes's mental health claim.  First on February 20, 2009 as discussed above and secondly on April 20, 2010.  While the substance of the September 10, 2010 decision and not the two prior decisions is directly before the Court, an examination of each decision demonstrates a pattern of arbitrary and capricious decision making with respect to Rhodes's mental health claim.

FRSLIC's February 20, 2009 decision finding that Rhodes's mental disorder was not severe enough to support Rhodes being totally disabled was itself likely arbitrary and capricious and not supported by substantial evidence.  In the documentation provided from Dr. Lorenzo, he reported that sometime in September 2008 Rhodes was brought to the emergency room in a state of emotional crisis and referred to him for an evaluation.  On December 12, 2008, Dr. Lorenzo indicated that Rhodes is "unable to return to work due to persistent depression." (AR 360-362).  Further, Rhodes's therapist Walker did not recommend that Rhodes return to work. (AR 379).  Therefore, Rhodes's treating physician and therapist concluded that her depression was severe enough to render her totally disabled beginning in December of 2008.

FRSLIC disregarded both Dr. Lorenzo and Walker's conclusions and determined that Rhodes's depression was not severe since Dr. Lorenzo had not scheduled a timely follow-up examination and had not changed Rhodes's dosage of Prozac.  FRSLIC in particular reasoned that "if your symptoms were moderate to severe enough to continue to impair work, than it would be reasonable to assess you would continue to need medication adjustments until your symptoms had improved." (AR 337-338). This justification ignores the fact that in addition to Dr. Lorenzo, Rhodes was being treated weekly by her therapist Walker.  Dr. Lorenzo, as a psychiatrist was primarily responsible for prescribing medication to supplement Walker's psychotherapy treatment.  (AR 380).  Both the

psychiatrist and therapist work in concert to ensure that a patient's mental health needs are met, thus regular appointments with Dr. Lorenzo were not required.  Therefore, FRSLIC's justification and conclusion that Rhodes's depression was not severe was based on partial assessments and was arbitrary and capricious because it was not supported by substantial evidence in the record and not based on all of the evidence in the record.

In addition, FRSLIC's April 20, 2010 decision finding that Rhodes's mental disorder was not severe enough to support Rhodes being totally disabled after January 12, 2010 was also likely arbitrary and capricious and not supported by substantial evidence. (AR 176-177).  FRSLIC concluded that the documentation from Dr. Lorenzo and Walker did not demonstrate that after January 12, 2010 Rhodes's depression was severe enough to continue to preclude work.  In particular, FRSLIC reasoned that since Dr. Lorenzo prescribed Rhodes Zoloft on January 12, 2010, "Dr. Lorenzo's notes do not note any paranoid or psychotic thinking and do demonstrate depressive symptoms have improved on Zoloft." (AR 177).  However after reviewing the documentation provided by Dr. Lorenzo, the Court is unable to find where in Dr. Lorenzo's notes he indicated that Rhodes's symptoms had improved on Zoloft.  Moreover, Dr. Lorenzo's records do not indicate that Rhodes ever suffered from paranoid or psychotic thinking.  Therefore, FRSLIC's conclusion that Rhodes's mental disorder improved on January 12, 2010 is not supported by substantial evidence.

       *iii.*    *FRSLIC's decision regarding Rhodes's mental health claim reflects its conflict of interest*

FRSLIC argues that its decision was not affected by its conflict of interest and points to the fact that it hired an independent medical examiner as a procedural safeguard to abate the risk of its conflict of interest. While courts have found that the failure to conduct an independent medical examination is one factor which can help demonstrate an administrator's conflict of interest, the Court does not find the fact that FRSLIC did conduct an independent medical examination to be dispositive as FRSLIC's reliance on Dr. Zeman's independent medical evaluation was itself arbitrary and capricious and reflective of its conflict of interest. *See Strope v. Unum Provident Corp.*, No.06-CV-628C, 2010 WL 1257917, at *7 (W.D.N.Y. 2010) ("the failure to order a timely IME or have a physician review a medical file has been described as a 'procedural irregularity' that is a factor to be considered in determining whether an administrator abused its discretion in denying a claim for benefits."). The typical scenario facing courts in ERISA reviews is where the opinions of the independent medical examiner conflicts with the opinions of the insureds' treating physicians. However, Dr. Zeman's opinion does not contradict Dr. Lorenzo or Walker's opinions and instead as discussed above FRSLIC arbitrarily interpreted Dr. Zeman's report to suit its own financial interests.

In addition, FRSLIC has not demonstrated that it took any other procedural safeguards such as walling off claims administrators or imposing management checks. Further, the record indicates a history of

erroneous denials and faulty administration of Rhodes's claims.  This is particularly true of her mental health claims.  At every instance where FRSLIC has reviewed and assessed Rhodes' mental health claim, FRSLIC's decision making has not been supported by substantial evidence and has been arbitrary and capricious.  While the reviews and reversals are indicative of FRSLIC's efforts to assure fairness, these efforts do not obviate the absence of substantial evidence to support its ultimate decision.

FRSLIC's decision to adopt the earliest date mentioned in Dr. Zeman's report as opposed to the later dates mentioned in his report or the date in which Rhodes began psychiatric treatment aligned with its financial interest.  If FRSLIC had adopted Dr. Zeman's suggestion that her work ability was impaired as of June 2008, then Rhodes would be entitled to eleven months of additional disability under the plan.  If FRSLIC had adopted September 2008, the date when Rhodes first began psychiatric treatment, then Rhodes would be entitled to fourteen months of additional disability under the plan.  By adopting the earliest date provided in Dr. Zeman's report which was not supported by or corroborated by any other evidence in the record, FRSLIC was able to avoid paying additional disability benefits under the plan to Rhodes.  These facts suggest that FRSLIC decision to rely on the earliest date provided by Dr. Zeman was motivated by its self-interest or by a desire to avoid paying benefits.  Even assuming that FRSLIC had significant procedural safeguards in place and

that its decision making wasn't influenced by its conflict of interest, the Court would still find that FRSLIC's denial of Rhodes's mental health claim was not supported by substantial evidence as explained above.

FRSLIC has therefore failed to make a reasoned determination supported by substantial evidence of when Rhodes's depression contributed to her "total disability" as defined by the plan.   Instead, FRSLIC made an arbitrary and capricious determination influenced by its conflict of interest.  A reasoned determination supported by substantial evidence would have taken into an account an assessment of the severity of her depression as well as the severity of Rhodes's physical disability, which FRSLIC has not done.   The mere fact that Rhodes suffered from depression is not sufficient to demonstrate that her depression contributed to her total disability.  It is possible that Rhodes's depression was so mild that it did not contribute to her work impairment.  FRSLIC must therefore determine based on the evidence in the record when Rhodes's depression was severe enough that it contributed to her inability to perform the material duties of her occupation or of any occupation.  Accordingly, the Court remands Rhodes's mental health disability claim to FRSLIC.   FRSLIC is ordered to reassess Rhodes's mental health disability claim in light of the Court's Order.

### Conclusion

Based upon the above reasoning, the Defendant's [Dkt. #34] motion for summary judgment is GRANTED IN PART AND DENIED IN PART and

Plaintiff's [Dkt. #36] cross motion for summary judgment is GRANTED IN PART AND DENIED IN PART.  The Court remands Rhodes's mental health claim and FRSLIC is ordered to reassess Rhodes's mental health claim in light of the Court's Order and issue a revised decision to Rhodes by January 31, 2012.  The Clerk is directed to administratively close the matter without prejudice to reopening on or before April 30, 2012 by Rhodes if she wishes to assert a challenge to FRSLIC's revised decision on her mental health claim.

IT IS SO ORDERED.


_____/s/_____

Hon. Vanessa L. Bryant

United States District Judge


Dated at Hartford, Connecticut: December 29, 2011